**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CAROLINE BERNHARD, CAROLINE BERNHARD ex rel. AMC and CAROLINE BERNHARD ex rel. AJC,

Plaintiffs,

v. Case No.: 3:25-cv-662-WWB-SJH

THE SCHOOL BOARD OF PUTNAM COUNTY,

Defendant.
_______________________________/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 29) and Plaintiff's Response (Doc. 36).[1] For the reasons set forth below, Defendant's Motion will be granted in part.

## I. BACKGROUND

Plaintiff Caroline Bernhard is the mother of A.J.C. and A.M.C, who are students at Palatka Junior Senior High School.[2] (Doc. 29-1 at 13:18–23; Doc. 29-2 at 9:2–5; Doc. 29-10 at 8:5–12). A.J.C. has a learning disability and, since kindergarten, has had an individualized education plan. (Doc. 29-2 at 22:1–12; *see also generally* Doc. 30-1).

---

[1] Defendant's Motion fails to comply with this Court's January 13, 2021 Standing Order. In the interests of justice, the Court will consider the Motion, but given the previous warnings on the matter, (*see* Doc. Nos. 5, 28, 33), the parties are advised that future failures to comply with all applicable rules and orders of this Court will result in the striking or denial of filings without notice or leave to refile.

[2] The Court will refer to Palatka Junior Senior High School as "Palatka High" or the "school" depending on context.

In 2021, Defendant, the School Board of Putnam County, hired Patrick Turner as head coach of Palatka High's football team. (Doc. 37-14 at 24:14–25:6). Turner came to Palatka High from Pedro Menendez High School and describes himself as the winningest coach in its history. (*Id.* at 23:1–2; Doc. 37-15 at 10:3–11). One of Turner's colleagues at Menendez described him as a "very good" coach with "a flawed character." (Doc. 37-16 at 34:3–4). Nevertheless, Turner was recommended for the head coaching position by his friend Robert Humphries, who at the time was Palatka High's athletic director. (Doc. 37-15 at 9:14–25, 10:14–20). Humphries spoke to the principal and athletic director at Menedez about Turner but did not conduct a formal background check or review Turner's personnel file before recommending him for hire. (*Id.* at 10:22–12:9).

A.J.C. joined the Palaka High football team in seventh grade as an offensive lineman. (Doc. 29-2 at 20:4–6, 21:16–21). He claims that, under Coach Turner, Palatka High would run "full contact drills basically every day." (*Id.* at 103:3–4). A.J.C. was injured in one such drill the summer before his ninth-grade year. (*Id.* at 27:5–12, 39:6–17).[3] According to A.J.C., the offensive and defensive lines were running through plays at full speed, despite not wearing pads. (*Id.* at 38:14–17, 39:23–25, 40:8–9, 42:22–24). In one iteration, A.J.C. pulled to make a block and was hit in the head by the forearm of a nose guard who "was [] trying really hard."[4] (*Id.* at 39:9–14). After the blow, A.J.C. "felt a little

[3] A.J.C. testified that players were not allowed to miss summer practices because he and others were given extra sprints if they missed one. (Doc. 29-2 at 42:25–43:3, 102:1–13). Turner maintained that *summer* practices were not mandatory but agreed that players were given extra sprints for missing practices generally. (Doc. 37-14 at 32:17, 35:16–22). Humphries stated that summer practices were not mandatory but acknowledged that it behooved players to attend them and "prepare [] physically to be able to play." (Doc. 37-15 at 17:17–21).

[4] The parties dispute whether certain coaches or school officials were present for the drill in question, but they agree that Paul Mast, A.J.C.'s offensive line coach, was

dizzy" but, figuring he was just dehydrated, "didn't think anything of it." (*Id.* at 42:3–5). He subbed himself out of the drill without telling any coaches that he was injured. (*Id.* at 41:6–9, 42:15–21, 44:13–15). Within minutes, practice ended. (*Id.* at 41:10–12). A.J.C. returned his cleats to the locker room and, feeling unstable, walked his bike home. (*Id.* at 41:12–14, 43:17–21). Later in the day, relatives noticed that A.J.C. was slurring his words and having difficulty reading and comprehending. (*Id.* at 48:22–49:2; Doc. 29-1 at 49:14–21, 67:20–22). Plaintiff took A.J.C. to the hospital, where he was diagnosed with a concussion. (Doc. 29-1 at 67:10–11, 70:24–71:2; Doc. 29-2 at 53:24–54:6; *see also* Doc. 37-20 at 25, 33–35).

One month after his injury, A.J.C. obtained a doctor's note memorializing his concussion, restricting football, and requesting an elevator pass for use at Palatka High. (Doc. 29-1 at 79:22–80:10; Doc. 29-2 at 62:24–63:9; *see also* Doc. 37-20 at 144). Shortly thereafter, the parties agree that Plaintiff served Defendant with a notice of intent to sue.[5] (*E.g.*, Doc. 29-1 at 121:2–19). Still, A.J.C. sought and received an elevator pass without opposition. (*Id*. at 80:14–18; Doc. 29-2 at 64:11–20). Because of A.J.C.'s lingering balance issues, subsequent notes restricted sports, physical education, and lifting heavy objects (e.g., band instruments). (Doc. 29-1 at 81:10–25; Doc. 37-9 at 3–4; Doc. 37-20 at 117, 145). Accordingly, A.J.C.'s instrument was carried by others and set on the ground for him to play. (Doc. 29-1 at 82:9–13).

---

there. (Doc. 29-2 at 43:24–44:2; Doc. 29-3 at 9:20–25). Mast testified that the offensive line was running through "no contact" "tempo plays," in which the offensive line would run through blocking assignments "on air," i.e., without an oppositional defensive line. (Doc. 29-3 at 10:8–11:4).

[5] The letter of intent Plaintiff provides is dated February 24, 2025, and references events that took place well after its agreed-on service date of August 1, 2023. (See Doc. 37-21 at 3).

The school year began on August 10, 2023. (Doc. 29-2 at 57:2–6). Either that day or the following morning, A.J.C. was getting ready to go to school when he got dizzy, fell, hit his head on the door of the family car, and got another concussion. (*Id.* at 52:14–53:6, 54:25–55:5; Doc. 29-1 at 70:19–23, 71:8–19, 72:18–20; Doc. 37-20 at 2–3, 107). Plaintiff notified Palatka High and took A.J.C. to the hospital for evaluation. (Doc. 29-1 at 72:13–23; Doc. 37-5 at 3). Doctors found excess fluid surrounding A.J.C.'s brain and kept him in the hospital overnight. (Doc. 29-2 at 55:9–24; *see also* Doc. 37-20 at 258).

After his second concussion, attending school and playing in the band became difficult for A.J.C. (Doc. 29-1 at 74:4–7, 77:1–6; *see also* Doc. 37-20 at 162). He was sensitive to noise and light, suffering from headaches, and began requesting and receiving additional accommodations.[6] (Doc. 29-1 at 77:3–18, 126:5–21; Doc. 29-2 at 65:1–22). He requested and received permission to wear sunglasses and headphones at school. (Doc. 29-1 at 77:19–25, 89:2–22; Doc. 29-2 at 67:12–20, 77:17–78:12; Doc. 37-9 at 2). He requested and received permission to take tests in a quiet environment. (Doc. 29-1 at 89:23–90:9; Doc. 29-2 at 74:11–24). He requested and received extra time between classes. (Doc. 29-2 at 73:24–74:8). Doctors recommended that A.J.C. be allowed to put his head down, retreat to a quiet place, or get picked up from school if he experienced worsening symptoms. (*Id.* at 75:17–76:24; Doc. 29-1 at 85:2–86:6). Eventually, in December 2023, they recommended that he attend only four hours of in-person school per day. (Doc. 29-2 at 75:7–16; Doc. 37-10 at 3; Doc. 37-23 at 3). Palatka

[6] The record is at times unclear as to who requested the accommodations in dispute. The Court will largely refer to A.J.C. as the requesting party.

High implemented each accommodation. (Doc. 29-2 at 75:12–16, 76:3–77:2, 79:20–24; *see also* Doc. 29-1 at 85:6–86:6).

For a time, however, Palatka High did not allow A.J.C. to participate in the band's performances at football games. (Doc. 29-1 at 91:6–92:13; *see also* Doc. 37-20 at 139–140). Plaintiff understood the restriction to be based on unclear or seemingly conflicting doctors' notes. (Doc. 29-1 at 120:10–121:1; *see also* Doc. 29-2 at 104:1–3). A.J.C. missed one band performance (seemingly one at a pep rally) before submitting an updated doctor's note that specifically allowed him to play from the stands. (Doc. 29-1 at 91:2–10, 122:15–17; Doc. 29-2 at 104:5–6; *see also* Doc. 37-2 at 2–3). Plaintiff claims that a dean accused her of forging the note because she obtained it so quickly. (Doc. 29-1 at 93:6–94:2, 122:10–12). A.J.C. testified that Principal Cathy Oyster accused Plaintiff of forging multiple notes because A.J.C. submitted so many of them. (Doc. 29-2 at 71:3–72:8). Oyster did not "recall anyone accusing anyone of forging anything," but stated that staff "questioned the inconsistency" of requesting to climb stairs to participate in band performances in the stands while still needing an elevator pass, sunglasses, and headphones for school. (Doc. 29-4 at 31:6–32:5; *see also* Doc. 37-26 at 22:10–23:13). In any event, after producing the updated note, A.J.C. performed from the bleachers while the rest of the band played on the field. (Doc. 29-1 at 92:23–93:5; Doc. 29-2 at 69:3–13, 73:1–8). Again, other students or parents would carry A.J.C.'s instrument for him and place it in its appropriate location in the stands. (Doc. 29-1 at 94:11–12; Doc. 29-2 at 70:8–15). A.J.C. then had to climb stairs to position himself to play, but he "just took it slow and . . . had people around [him] help" with the endeavor. (Doc. 29-2 at 70:11–12).

Despite his accommodations, A.J.C.'s headaches persisted and left him "only going to school once or twice a week." (*Id.* at 75:25–76:1). Because A.J.C. was missing school so frequently, Plaintiff began inquiring about options for at-home or virtual-schooling. (Doc. 29-1 at 96:16–19). School records reflect that Plaintiff inquired into at-home schooling during a November 15, 2023 phone call with a Palatka High employee. (Doc. 37-5 at 2). After the call, the employee apparently informed the school's principal, vice-principal, and director of homebound education about the conversation. (*Id.*). The last evidently planned to contact Plaintiff, (*see id.*), though the record does not reflect that he or she did. E-mail records suggest that Plaintiff spoke to school officials again on December 1, 2023, and engaged with them for about one month before applying for virtual school at some point after January 8, 2024.[7] (Doc. 37-23 at 2–12; *see also* Doc. 29-1 at 99:22–24; Doc. 29-2 at 83:11–15; Doc. 37-13 at 2). A.J.C. testified that he "kn[e]w [Palatka High] wouldn't let [him] enroll earl[ier]" because he "th[ought]" that he had "tr[ied]" to enroll back in October 2023. (Doc. 29-2 at 106:13–19). But when asked specifically about this and other delays, A.J.C. denied further knowledge and stated that Plaintiff handled his accommodation requests. (Doc. 29-2 at 82:1–9, 106:8–19, 108:14–109:2). Plaintiff, meanwhile, does not recall filling out a virtual school application. (Doc. 29-1 at 99:2–4, 102:11–13). The application she provides in the record contains her e-mail address and expressly disclaims a live-teacher component, states that parents must

---

[7] As Defendant states in its Motion, the e-mails also expressly provide that no application had been filed as of December 20, 2023. (Doc. 29 at 7; Doc. 37-23 at 3). Plaintiff testified that her first request for virtual school admission occurred in-person at the school board office, at an unknown time. (Doc. 29-1 at 96:20–97:4, 123:25–124:2). She does not otherwise recall the meeting and does not know whether she ever discussed a perceived delay in the admissions process. (*Id.* at 97:13–15, 125:17–23).

assist in and monitor the student's progress or assign such responsibility to another party, and advises that virtual school "is not a cure for poor attendance." (Doc. 37-13 at 3–4). Students are not accepted into virtual school until such an application is received. (Doc. 29-4 at 39:20–23).

Because of his absences, A.J.C. had to start over on his fall coursework when he began virtual school midway through the academic year.[8] (Doc. 29-2 at 80:3–13, 82:10–12, 85:2–9). Still, A.J.C. began struggling and requested a tutor, only to be rebuffed by Palatka High. (*Id.* at 85:20–22, 86:20–87:6; Doc. 29-1 at 125:6–16). He does not know why the request was declined and specifically denied knowledge of the decision being related to either his concussion symptoms or learning disability. (Doc. 29-2 at 107:24–108:6). He returned to Palatka High for in-person school at the beginning of the 2024 school year and is now in his senior year. (*Id.* at 85:14–19). A.J.C. was prescribed glasses following his second concussion but is otherwise fully recovered and symptom free. (*Id.* at 88:4–89:15, 93:9–96:11).

Meanwhile, A.M.C. had her own problems at Palatka High, whose dress code prohibits pajama sets, slippers, onesies, and revealing shorts. (Doc. 37-6 at 2; Doc. 37-11 at 3). In December 2023, A.M.C. wore a matching pajama set to movie day at Palatka High. (Doc. 29-10 at 17:15–18:3). A.M.C. testified that, even though the dress code is discussed with students at the beginning of each schoolyear, an unknown teacher or "[t]he

[8] A.J.C. testified that he attended virtual school "full time" in addition to working every weekend as a ranch hand. (Doc. 29-2 at 82:13–15; *see also id.* at 11:15–13:2). But Plaintiff testified that A.J.C. "wasn't doing . . . much [virtual school] because some days he would wake up and [] would just have a headache so bad that he couldn't get up and concentrate and look at a computer screen." (Doc. 29-1 at 88:5–8). To make matters even less clear, Plaintiff was apparently referring to a period in December 2023, before A.J.C. had applied to or started virtual school. (*See id.* at 87:2–12).

school" approved wearing pajamas for that particular day of spirit week.[9] (*Id.* at 11:19–13:21, 18:7–19:12). Nevertheless, Assistant Principal Lamar Purifoy caught A.M.C. getting out of the car at the school's drop-off location and told her to go back home and change. (*Id.* at 22:15–19; Doc. 29-8 at 5:16–21, 10:13–20). Plaintiff argued with Purifoy over A.M.C. being forced to change clothes while "other kids were walking around [] looking like hoes." (Doc. 29-1 at 113:20–114:13; Doc. 29-8 at 10:18–24). Thereafter, Plaintiff took A.M.C. home to change. (Doc. 29-8 at 10:24–11:1; Doc. 29-10 at 22:20–23:4). Oyster and Purifoy claim that, in doing so, Plaintiff recklessly sped off through the parking lot. (Doc. 29-4 at 22:15–23:2, 27:19–28:2; Doc. 29-8 at 10:24–11:2). Plaintiff and A.M.C. deny that Plaintiff sped away. (Doc. 29-1 at 112:7–9, 114:24–115:1; Doc. 29-10 at 21:20–22). A.M.C. went home, changed into a non-matching set of pajamas, and returned to school without issue. (Doc. 29-10 at 22:20–23:16). Upon returning to school, Plaintiff had some sort of interaction with a school resource officer in which he addressed her allegedly careless driving and in which she denied speeding away. (Doc. 29-1 at 114:14–115:1; Doc. 29-8 at 11:3–12). Thereafter, ostensibly on account of Plaintiff's derogatory language and allegedly reckless driving, Oyster requested, and the sheriff's office issued, a trespass order barring Plaintiff from Defendant's properties. (Doc. 37-4 at 2; *see also* Doc. 29-4 at 23:13–24:2, 27:14–18, 42:8–44:1). The order advised Plaintiff that she could be arrested for returning to school property before its expiration on

[9] Principal Oyster claims that A.M.C. wore a onesie; Assistant Principal Lamar Purifoy claimed she wore some form of pajamas but was unsure about a onesie. (Doc. 29-4 at 21:21–25; Doc. 29-8 at 13:9–14). Purifoy also claims that the announcement at issue expressly reminded students that pajamas were prohibited. (Doc. 29-8 at 10:7–12).

December 21, 2025. (Doc. 37-4 at 2; *see also* Doc. 29-1 at 113:15–19, 115:23–116:5; Doc. 29-4 at 45:9–12; Doc. 37-3 at 2).

The following year, and again in 2025, an unknown employee determined that A.M.C.'s shorts were impermissibly short and had her stepfather bring in a change of clothes. (Doc. 29-10 at 19:18–20:21, 23:17–24:12). On the first occasion, an unknown dean had A.M.C. sit in detention during lunch. (*Id.* at 28:19–29:9). On the latter occasion, A.M.C. sat in an "ISS"—presumably an in-school suspension—until she could change into new clothes. (*Id.* at 16:10–15, 24:14–23). A.M.C. was never written up for formal discipline as a result of her possible dress code infractions. (*Id.* at 16:20–25, 23:5–16, 24:16–25:6; Doc. 29-4 at 28:21–25; Doc. 29-8 at 9:17–10:1, 23:22–25).

Plaintiff brings nine claims against Defendant. (*See generally* Doc. 21). On behalf of A.J.C., she alleges claims for negligence (Count I), negligent supervision (Count II), negligent retention (Count III), negligent hiring (Count IV), disability discrimination (Count V), and ADA retaliation (Count VI). (*Id.* at 11–22). She also alleges claims for ADA retaliation based on association, both on behalf of A.M.C. (Count VII) and in her own capacity (Count VIII). (*Id.* at 22–26). Finally, she alleges a *Monell* claim for First Amendment retaliation (Count IX) in her own capacity. (*Id.* at 27–29). Defendant seeks summary judgment on Counts II–IX. (*See generally* Doc. 29).

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

## III. DISCUSSION

The Court first addresses its authority to enter prospective equitable relief in favor of Plaintiff. Plaintiff seeks an injunction lifting her trespass order and barring Defendant from violating state and federal law. (*See* Doc. 21 at 29–30). "[A]n injunction demanding that a party do nothing more specific than 'obey the law' is impermissible" in the Eleventh Circuit. *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (citing *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999)). Further, Article III confines the Court's

equitable remedial powers to justiciable cases and controversies and thus bars the Court from entering an "advisory" injunction in which Plaintiff "lack[s] a legally cognizable interest." *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997) (quotation omitted). Because this mootness inquiry reflects a jurisdictional bar, it is properly raised *sua sponte*. *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1331–32 (11th Cir. 2005). Here, Plaintiff's trespass order expired on December 21, 2025, and Plaintiff lacks a legally cognizable interest in having this Court remedy that which has already been remedied by time alone. *See Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1302–03 (11th Cir. 2023). Moreover, to the extent Plaintiff seeks to enjoin Defendant from delaying or denying A.J.C.'s accommodations, or from accusing Plaintiff of forging doctors' notes, (*see* Doc. 21 at 20–22), A.J.C. already received all but one of his requested accommodations and, in any event, he has since returned to in-person school (and football) without any of the post-concussion symptoms that necessitated his accommodations. (Doc. 29-2 at 59:11–23, 88:22–89:15, 96:7–11). Lastly, "[n]othing in the record supports a 'reasonable, non-speculative expectation that the[se] allegedly unlawful action[s] will happen again.'" *Safe Affordable Ga., Inc. v. Kreyenbuhl*, No. 26-10312, 2026 WL 3203276, at *3 (11th Cir. Oct. 26, 2026) (quoting *Health Freedom Def. Fund v. President of the United States*, 71 F.4th 888, 893 (11th Cir. 2023)). Thus, assuming that Plaintiff had standing to seek these more targeted forms of injunctive relief at the initiation of this lawsuit, her requests for such relief have since become moot.

**A. Negligent Supervision, Retention, and Hiring (Counts II–IV)**

Plaintiff alleges that Defendant's negligent supervision, retention, and hiring of Coach Turner caused A.J.C. to be injured at football practice. School boards have a

"'common law duty to protect [students] from the result of negligent hiring, supervision, or retention' of employees 'whose negligent or intentional acts . . . [could] foreseeably cause injuries to students.'" *C.H. ex rel. Hilligoss v. Sch. Bd. of Okaloosa Cnty.*, 606 F. Supp. 3d 1186, 1200 (N.D. Fla. 2022) (alterations in original) (quoting *Sch. Bd. of Orange Cnty. v. Coffey*, 524 So. 2d 1052, 1053 (Fla. 5th DCA 1988)). However, "[u]nder Florida law, a claim for negligent hiring, retention, or supervision requires that an employee's wrongful conduct be committed outside the scope of employment." *Matz v. Bond*, No. 3:25-cv-397, 2026 WL 1847502, at *4 (M.D. Fla. June 26, 2026) (quotation omitted) (collecting cases). Defendant contends that no evidence suggests that Turner was acting outside of his employment at the practice in question and therefore Defendant argues that it cannot be liable under Counts II, III, and IV. Plaintiff fails to offer a response. And though she did allege, for the purposes of these counts, that Turner was acting outside the scope of his employment, (*see* Doc. 21 at 13–14, 16), she fails to identify any evidence suggesting that was the case.[10] Plaintiff does state that "Defendant's duties under these claims were operational . . . [and] not discretionary planning functions," (Doc. 36 at 9), by which she appears to argue that the discretionary function exception to Florida's waiver of state sovereign immunity does not bar her claims. *See, e.g.*, *Wallace v. Dean*, 3 So.

[10] Notably, had Plaintiff shown that Turner was acting outside the scope of his authority, state sovereign immunity would bar her claim because Florida has waived sovereign immunity only with respect to the tortious acts of employees "acting *within* the scope of [their] office or employment." Fla. Stat. § 768.28(1) (emphasis added); *see also id.* § 768.28(9)(a) ("The state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment . . . ."); *McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996) ("[W]here the employee's act f[alls] outside the scope of employment, . . . sovereign immunity [] shields the employing agency from liability.").

3d 1035, 1053 (Fla. 2009). That is irrelevant, even if correct. The Court therefore agrees with Defendant.

Additionally, had Plaintiff attempted to create a genuine factual dispute concerning the scope of Turner's employment, it is difficult to conceive of how administering a blocking drill at football practice would fall outside of it. "An employee's conduct is within the scope of his employment, where (1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Purcell v. City of Fort Lauderdale*, No. 21-cv-61006, 2025 WL 1825254, at *4 (S.D. Fla. July 2, 2025) (quoting *Ibarra v. Ross Dress for Less, Inc.*, 350 So. 3d 465, 467 (Fla. 3d DCA 2022)). A.J.C. was injured in a football drill during a football practice allegedly administered by Palatka High's head football coach. Accepting that Turner administered the drill irresponsibly or in contravention of FHSAA rules does not place his actions outside the scope of his employment. See *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 750 (Fla. 1st DCA 1985) ("[C]onduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that authorized or is incidental to the conduct authorized."); *cf. Hung Phan v. City of St. Petersburg*, No. 8:06-cv-01818-T, 2007 WL 1225380, at *6 (M.D. Fla. Apr. 25, 2007) ("[A]n officer who uses excessive force during the course of an arrest is acting while in the scope of his or her employment as a law enforcement officer." (citing *McGhee v. Volusia Cnty.*, 679 So. 2d 729 (Fla. 1996))). Summary judgment will therefore be granted on Counts II–IV.

**B. Disability Discrimination (Count V)**

Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act both "forbid discrimination on the basis of disability in the provision of public services." *J.S., III ex rel. J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). To raise a viable claim under either law, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Id.* (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). Typically, "Title II and § 504 claims are analyzed together," *Lewis v. Sheriff, Fulton Cnty.*, 166 F.4th 107, 114 (11th Cir. 2026), though plaintiffs seeking relief under § 504 must meet a higher standard of causation. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); 29 U.S.C. § 794(a) (barring discrimination based "solely" on a disability). A higher standard is also imposed where, as here, a plaintiff seeks damages as opposed to injunctive relief. To recover damages, plaintiffs must show "that the defendant acted with 'deliberate indifference'—in other words, that the defendant is an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf and had actual knowledge of discrimination in the entity's programs and failed adequately to respond." *Lewis*, 166 F.4th at 114 (quotation omitted). Stated more broadly, appropriate "school administrators [are only] deemed deliberately indifferent [where] their response . . . or lack thereof [wa]s clearly unreasonable in light of the known circumstances." *J.S.*, 877 F.3d at 987 (quotation omitted).

Here, Defendant argues that Plaintiff fails to establish discrimination and causation. Defendant claims that undisputed evidence shows that A.J.C.'s requested accommodations were all implemented. Additionally, Defendant argues that, as far as Plaintiff alleges discrimination based on A.J.C. not being provided a tutor or experiencing delay in his enrollment into virtual school, no evidence suggests his disability played a role in Palatka High's actions. Plaintiff responds to the discrimination argument with three theories of delayed or denied accommodations, arguing that (1) Palatka High delayed A.J.C.'s admission into virtual school, causing him to fall hopelessly behind in his classes; (2) Palatka High unnecessarily delayed A.J.C.'s return to band by requiring clearance from his doctors after he had already provided it; and (3) Palatka High denied A.J.C.'s requests for a tutor.

To begin, only Palatka High's denial of a tutor arguably constitutes discrimination or an unlawful exclusion of services. First, as to Defendant's alleged delay in enrolling A.J.C. into virtual school, A.J.C. believes that he made some sort of attempt to enroll in October 2023 and stated that Palatka High would not allow it. But it is undisputed that students must apply to virtual school before they are enrolled, and such neutral administration of enrollment rules is no form of discrimination, much less deliberate indifference. *See Doe ex rel. A.W. v. Hernando Cnty. Sch. Bd.*, No. 8:23-cv-1772, 2026 WL 2883365, at *6 (M.D. Fla. Sept. 25, 2026) ("A school board does not engage in intentional discrimination where there is no evidence that the school board applied its policies or rules unevenly with respect to disabled students." (citing *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 604 (11th Cir. 2010))). Moreover, Plaintiff does not argue, and the evidence does not reasonably suggest, that A.J.C. specifically sought

an accommodation to waive Palatka High's application requirement. *Cf. Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made . . . ."). Rather, the evidence shows that A.J.C. was still seeking accommodations for in-person school as late as December 2023 and did not apply to virtual school until January 2024. Thereafter, he was admitted without any evidentiary inference of delay. Even A.J.C.'s statements on the matter—that Palatka High would not let him enroll earlier—are conclusory and necessarily speculative, as they rest on an unsupported belief that he had previously tried to partake in an admissions process that he admittedly lacked knowledge of and, indeed, repeatedly disclaimed partaking in. (*See* Doc. 29-2 at 82:1–9, 106:8–19, 108:14–109:2). No reasonable jury could construe his statements as raising a genuine dispute over the alleged delay in his virtual school admission—"instead, [they] create[] a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation omitted). Second, as to A.J.C.'s return to band, the record shows that Palatka High implemented all of A.J.C.'s requested accommodations consistent with the numerous and varied doctor's notes he supplied, once he supplied them. In both of these instances, Palatka High's actions were inescapably reasonable. *See J.S.*, 877 F.3d at 987 (stating that courts "may, on a motion for summary judgment, determine that a[n administrator's] response was not 'clearly unreasonable' as a matter of law" (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999))).[11]

[11] The court notes that Plaintiff's sole theory of deliberate indifference relates to Palatka High's alleged delay in enrolling A.J.C. in virtual school. (Doc. 36 at 14).

Finally, as to A.J.C.'s request for a tutor, Palatka High expressly disclaims any live component to their virtual school program, holds parents responsible for assisting in and monitoring their child's progress therein, and advises that "students [should] have a positive history of attendance" because virtual school "is not a cure for poor attendance." (Doc. 37-13 at 3–4). Assuming that such a policy denied A.J.C. the benefits of virtual school—which, according to Plaintiff, A.J.C. could hardly attend anyway—Plaintiff omits any argument on Palatka High's reasons for denying A.J.C. a tutor. In fact, the same is true with respect to Plaintiff's other two theories of discrimination. Plaintiff simply cites back to certain paragraphs in her "Statement of Disputed Facts" section, but none of the cited paragraphs provide facts suggesting that Palatka High's alleged discrimination was related to A.J.C.'s disability. (*See* Doc. 36 at 5–7, ¶¶ 15–19, 22). Nor does the record evidence properly cited in Plaintiff's disputed fact section.[12] Indeed, A.J.C.'s disability is hardly specified in the record. Both Plaintiff's Response and the Corrected Amended Complaint seem to identify A.J.C.'s concussion symptoms as the "disability" for which he sought accommodations. (*E.g.*, Doc. 21 at 19–20; Doc. 36 at 12). But confusingly, to the limited extent that Plaintiff and A.J.C. testified to Palatka High's motivation throughout the

[12] To the extent that Plaintiff impliedly asks the Court to follow the internal citations in her argument section to the statements of fact in her fact section and, from there, scour the cited record documents—the majority of which lack pinpoint citations—in search of an inference of causation, the Court declines to do so. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (internal citation omitted)); (Doc. 26 at 7 ("Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact. General references to a deposition are inadequate.")).

accommodation process, they pointed only to A.J.C.'s learning disability as their perceived reason for experiencing a delay in virtual school admission. (*See* Doc. 29-1 at 126:22–127:14; Doc. 29-2 at 106:23–108:6). These conclusory assertions cannot create a genuine dispute over Palatka High's reasons for taking the three actions Plaintiff views as discriminatory, but one would at least expect them to match the theory presented in Plaintiff's Response and operative pleading. Alas, they do not. Even granting the dubious premise that Palatka High excluded or discriminated against A.J.C. in the three actions Plaintiff identifies, Plaintiff fails to show that any alleged discrimination resulted from a disability—whichever one Plaintiff intends to rely on. Accordingly, Defendant is entitled to summary judgment on Count V.

**C. ADA Retaliation (Count VI)**

To establish a prima facie case of retaliation under the ADA, a plaintiff suing a public entity must show that she engaged in statutorily protected activity, that she experienced an adverse action, and that the adverse action was causally related to her protected activity. *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 (11th Cir. 2003). "Clearly, a plaintiff need not demonstrate an adverse *employment* action when establishing a prima facie case of retaliation in the public services or accommodations contexts of the ADA, only that some type of action occurred that sufficiently qualifies as adverse under the circumstances of the case." *Id.* at 1181.

Defendant argues that Plaintiff fails to establish an adverse action and a causal relationship, again because A.J.C. received the accommodations he requested and because any delay in his virtual school enrollment was attributable to his delay in applying. Plaintiff responds that Palatka High's delays and denials of requested accommodations

constituted adverse actions. Plaintiff alternatively argues that Palatka High's accusation of forgery was an adverse action. Neither argument is persuasive.

Plaintiff's overt attempt to reassert her accommodation claim under the ADA's retaliation provision fails as a matter of law—"a plaintiff may not point to the denial of [a] reasonable accommodation as [the] adverse action" underlying a retaliation claim. *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 999 (11th Cir. 2025) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)). Moreover, Plaintiff brings Count VI as parent and guardian of A.J.C., alleging that A.J.C. engaged in protected activity and that Defendant retaliated against A.J.C for said activity. (Doc. 21 at 20–21). To the extent Plaintiff claims that her being accused of forging a doctor's note was an adverse action *against A.J.C.*, the Court struggles to understand how. "[T]he text of § 12203(a) only prohibits retaliation against an individual when 'such individual' has engaged in protected activity—it does not prohibit retaliation against an individual over the protected activity of others." *Colley ex rel. Colley v. City of Orange Beach*, No. 1:25-00346, 2026 WL 2790111, at *10 (S.D. Ala. Sept. 17, 2026) (collecting cases). Regardless, the alleged accusation was plainly related to A.J.C.'s underlying accommodation request. Were the Court to evaluate them separately, Plaintiff would still fail to show a triable issue on whether the accusation, standing alone, "result[ed] in some tangible, negative effect" on either her or A.J.C. *Momanyi v. Bd. of Trs. of the Univ. of Ala. at Birmingham*, No. 24-14244, 2026 WL 2546888, at *7 (11th Cir. Aug. 28, 2026) (alteration in original) (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004)).

The Court notes that Plaintiff alternatively alleges a § 12203(b) interference claim in Count VI, but she does not defend that claim in her Response. (*See* Doc. 21 at 21;

Doc. 36 at 14–15 (arguing that "Plaintiffs" were retaliated against through Defendant's adverse actions without mentioning interference, coercion, intimidation, or threats); *cf. Oirya v. Mando Am. Corp.*, No. 23-11429, 2024 WL 1462500, at *8 (11th Cir. Apr. 4, 2024) (rejecting argument that "conflate[d] an ADA interference claim under 42 U.S.C. § 12203(b)," which was not relied on in district court, "with an ADA retaliation claim under 42 U.S.C. § 12203(a)"); *Resol. Tr. Corp.*, 43 F.3d at 599 ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Moreover, there remains no evidentiary inference that being accused of forgery, by itself, had any tangible effect on either Plaintiff or A.J.C. "Persuasive authority [] supports that the ADA's anti-interference provision prohibits only 'discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her ADA rights.'" *Schwarcz v. Walt Disney Parks & Resorts U.S., Inc.*, No. 6:25-cv-640, 2026 WL 864829, at *7 (M.D. Fla. Mar. 30, 2026) (quoting *Mosley v. AM/NS Calvert, LLC*, No. 1:20-00517, 2022 WL 843773, at *9 (S.D. Ala. Mar. 21, 2022)); *see also Patel v. Baycare Health Sys., Inc.*, No. 8:24-cv-1886, 2026 WL 1481504, at *15 (M.D. Fla. May 27, 2026).[13]

In sum, Plaintiff cannot make out a prima facie case of retaliation. And though she does not argue that circumstantial evidence creates a triable issue of fact under a "convincing mosaic" theory, the Court has reviewed the record and found no evidentiary

---

[13] *Some* such effect would seem to be required insofar as Congress enacted the ADA pursuant to its power to regulate interstate commerce (or activities that substantially affect interstate commerce). *Cf.* 42 U.S.C. § 12101(b)(4) (invoking both Congress's authority to regulate commerce and its authority to enforce the Fourteenth Amendment).

inference as to the existence of a qualifying adverse action. Defendant is thus entitled to summary judgment on Count VI.

**D. ADA Associational Retaliation (Counts VII–VIII)**

These claims are not models of clarity. Plaintiff alleges that Defendant retaliated against her and A.M.C. for opposing, or being associated with another person who opposed, Defendant's alleged discriminatory behavior. (Doc. 21 at 23, 25). Plaintiff also alleges that Defendant interfered with her and A.M.C.'s rights under the ADA. (*Id.*). Alternatively, Plaintiff alleges that Defendant interfered with her and A.M.C. because they aided or encouraged another (presumably A.J.C.) in the exercise of his ADA rights. (*Id.*). Defendant moves for summary judgment on Plaintiff's primary theory—retaliation—arguing that Plaintiff fails to establish that any of Defendant's allegedly retaliatory acts were causally related to protected activity. Defendant also appears to argue that issuing a trespass order to Plaintiff was not an adverse action. Plaintiff only defends Counts VII and VIII as claims for "association discrimination" under the elements articulated by *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230–31 (11th Cir. 1999). (Doc. 36 at 18). *Hilburn* concerned a claim of association discrimination in the employment context. *See* 181 F.3d at 1230–31. However, Plaintiff conspicuously deleted and otherwise altered the claim's elements to reflect that this case does not occur in the employment context. Plaintiff has provided no judicial authority contemplating this type of claim and the relevant ADA provisions confirm that it does not exist.

Title I of the ADA bars employers from discriminating against qualified employees on the basis of disability. 42 U.S.C. § 12112(a). "As [it is] used in [Title I]," discrimination can mean "excluding or otherwise denying equal jobs or benefits to a qualified individual

because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* § 12112(b)(4); *see also Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1318 (11th Cir. 2019). Title II of the ADA bars public entities from discriminating against a qualified individual on the basis of *his own* disability. 42 U.S.C. § 12132. There is no "association discrimination" provision in Title II and, to the extent Plaintiff attempts to impose liability for such a violation, her claim fails.

Title V of the ADA contains two somewhat distinct yet partially overlapping proscriptions. *See* 42 U.S.C. § 12203. Section 12203(a) bars persons from retaliating against an individual because that individual has opposed acts made unlawful elsewhere in the ADA, or because the individual personally participated in an ADA-related investigation or proceeding. Section 12203(b) makes it unlawful to coerce, intimidate, threaten, or interfere with an individual's exercise of her own ADA rights, and also makes it unlawful to interfere with an individual on account of her having aided or encouraged *another* in the use or enjoyment of *his* ADA rights. Because association discrimination is only prohibited in the employment context, Title V does not, in the public services context, prohibit retaliation on the basis of one's association with a disabled person. To the extent Plaintiff attempts to impose liability for such a violation, her claim fails. Additionally, while § 12203(b) would seem to prohibit interfering with an individual on account of her having aided or encouraged another in his exercise or enjoyment of Title II rights, once again, Plaintiff does not defend Counts VII or VIII on this ground. Plaintiff argues that "A.M.C. and Plaintiff Bernhard were subject to adverse actions" and "retaliatory acts," (Doc. 36 at

18, 20–21), not interference, coercion, intimidation, or threats. *See Oirya*, 2024 WL 1462500, at *8; *Resol. Tr. Corp.*, 43 F.3d at 599.

Even if the Court were to construe Plaintiff as defending Counts VII and VIII on the secondary alternative theory she raised in the Corrected Amended Complaint, Count VII would still fail because, as Plaintiff tacitly admits, no evidence suggests A.M.C. played a role in advocating for A.J.C.'s rights under the ADA. (*See* Doc. 29-10 at 10:22–11:5; Doc. 36 at 19 (arguing that "actions against both A.M.C. and Plaintiff Bernhard infer that *their association* with A.J.C. and *Plaintiff Bernhard's advocacy for accommodations* for A.J.C. are the reasons that both A.M.C. and Plaintiff Bernhard were targeted")). As to Count VIII, while there is plenty of evidence that Plaintiff aided and encouraged A.J.C., being accused of forging a note that was otherwise accepted and implemented is not an adverse action for reasons already addressed. And finally, while Plaintiff frames her trespass order as being causally related to her accommodation advocacy because the two events were close in time, she fails to raise a genuine dispute of fact on the matter. Plaintiff argues that, on the day she received a trespass order, she had challenged Assistant Principal Purifoy on whether A.M.C.'s dress code violation was related to A.J.C.'s accommodation requests. (Doc. 36 at 20). Again, Plaintiff cites to certain paragraphs in her "Statement of Disputed Facts" section as support for this claim, but they provide no support for it, and neither does the record evidence cited therein. (*See id.* at 7–8; Doc. 29-1 at 111:16–116:6; Doc. 29-4 at 48:3–14; Doc. 29-8 at 9:17–12:23). Nor does Plaintiff point to any other instances of aiding or encouraging A.J.C. that could establish a causal connection for her (abandoned) interference theory. Accordingly, Defendant is entitled to summary judgment on Counts VII and VIII.

### E. *Monell* Claim for First Amendment Retaliation (Count IX)

To impose § 1983 liability on a county school board, "a plaintiff must show: (1) that h[er] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see also Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1276 n.9 (11th Cir. 2000). Here, the first element is satisfied if Plaintiff shows that she engaged in constitutionally protected speech, that Defendant's retaliation adversely affected her protected speech, and that a causal connection exists between Defendant's retaliation and its adverse effects on Plaintiff's speech. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). Plaintiff's speech was adversely affected if Defendant's "allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). The adverse effects on Plaintiff's speech were causally related to Defendant's retaliation if Plaintiff can "show that [Defendant] was subjectively motivated to take the adverse action because of [her] protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).

Here, Defendant briefly argues that Plaintiff has not shown that her constitutional rights were adversely affected, or that her speech was related to Defendant's allegedly adverse acts.[14] Plaintiff responds that being accused of forging a doctor's note and being

[14] Defendant also disputes whether Plaintiff has identified a qualifying custom or policy. But because Plaintiff does so in one unsupported sentence and has not briefed an applicable legal standard for *Monell* claims, this argument, like others addressed in this Order, has been abandoned.

trespassed from Defendant's properties would likely deter a person of ordinary firmness from speaking out on behalf of her children against school officials. Plaintiff's forgery argument fails here for similar reasons that it failed in Count VI. To the extent that any harm from Defendant's accusation[15] is severable from the harm caused by Defendant's alleged delay of accommodations, the record still fails to show that the accusation had any effect on Plaintiff. *See Bennett*, 423 F.3d at 1255 (stating that, while not dispositive, a "plaintiff's actual response to the [defendant's] conduct provides some evidence of the tendency of that conduct to chill First Amendment activity" (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005))). More importantly, Plaintiff fails to support the conclusory assertion that being accused in such a manner "would certainly deter a person [of ordinary firmness] from speaking out against school officials." (Doc. 36 at 22). Regardless, the Court disagrees. Most circuits "require[] that an official's retaliatory speech amount to a threat, coercion, or intimidation to reconcile two competing rights: a plaintiff's right to be free from retaliation for exercising his First Amendment rights and an official's right to engage in protected speech." *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019). The Eleventh Circuit has neither adopted nor rejected the majority test, but it does require plaintiffs to show "more than [a] *de minimis* inconvenience in the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1253. Plaintiff here cannot do so. After submitting a multitude of doctors' notes that, as all sides admit, seemed to be contradictory, and after being questioned with regard to the authenticity of such notes, a person of ordinary firmness would act just as Plaintiff acted

[15] The Court reiterates that Plaintiff does not know who accused her of forging the note.

in obtaining further documentation, clearing up the confusion, and continuing to seek further accommodations.

Plaintiff's trespass argument is far more meritorious. The trespass order barred Plaintiff from her children's school, as well as Defendant's remaining properties, under threat of arrest—"the quintessential retaliatory [action] that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023). Moreover, for the purposes of Count IX, Plaintiff argues that her trespass order was related to her speech on Defendant's dress code enforcement, rather than her speech on A.J.C.'s accommodations. To its detriment, Defendant fails to address this distinction. That Plaintiff's "derogatory" speech on A.M.C.'s pajamas and Palatka High's dress code was causally related to the trespass order is clearly supported in the record and on the face of the order itself. (Doc. 29-4 at 22:22–24, 27:14–18, 43:25–44:1; Doc. 37-4 at 2). Additionally, in reiterating its "previously discussed" argument on a legitimate, non-retaliatory reason for issuing the order, (Doc. 29 at 25), Defendant appears to point the Court to an argument that the order was in fact based, in part, on Plaintiff's "use of disparaging comments about other students," (*id.* at 23). Defendant has not attempted to show that it "would have taken the same action in the absence of" such speech. *Castle*, 631 F.3d at 1197. Nor has Defendant disputed that the speech is protected. Thus, on the briefing before the Court, triable issues remain on Count IX.

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 29) is **GRANTED** as to Counts II–VIII and **DENIED** in all other respects.

**DONE AND ORDERED** in Jacksonville, Florida on November 24, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record